FILED
United States Court of Appeals
Tenth Circuit

July 19, 2017

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

CHEVRON MINING INC.,

        Plaintiff - Appellant,

v.

UNITED STATES OF AMERICA,
UNITED STATES DEPARTMENT
OF THE INTERIOR, and UNITED
STATES DEPARTMENT OF
AGRICULTURE,

        Defendants - Appellees.

---------------

AMERICAN EXPLORATION &
MINING ASSOCIATION,
COLORADO MINING
ASSOCIATION, and STATE OF
MONTANA,

        Amici Curiae.

No. 15-2209

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. 1:13-CV-00328-MCA-KK)**

Peter D. Keisler, Sidley Austin LLP (Jennifer G. Anderson, Alex C. Walker, and
Jeremy K. Harrison, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque,
New Mexico, R. Timothy McCrum, Kirsten L. Nathanson, and Sherrie A.
Armstrong, Crowell & Moring LLP, Washington, D.C., and Quin M. Sorenson
and Christopher A. Eiswerth, Sidley Austin LLP, Washington, D.C., with him on
the briefs), Washington, D.C., for Appellant.

Katherine J. Barton, Environment & Natural Resources Division, United States Department of Justice (John C. Cruden, Assistant Attorney General, Simi Bhat, Justin D. Heminger, Dustin J. Maghamfar, John E. Sullivan, and Evelyn S. Ying, Environment & Natural Resources Division, United States Department of Justice, and of Counsel: Joan Marsan, Office of the Solicitor, United States Department of the Interior, and Kirk Minckler, Office of the General Counsel, United States Department of Agriculture, with her on the brief), Washington, D.C. for Appellees.

Gina Cannan and Steven J. Lechner, Mountain States Legal Foundation, Lakewood, Colorado, on the brief for Amici Curiae American Exploration & Mining Association and Colorado Mining Association.

Timothy C. Fox, Montana Attorney General, Alan Joscelyn, Chief Deputy Attorney General, and Dale Schowengerdt, Solicitor General, Office of the Montana Attorney General, Helena, Montana, on the brief for Amicus Curiae State of Montana.

---

Before **TYMKOVICH**, Chief Judge, **BALDOCK**, and **BRISCOE**, Circuit Judges.

---

**TYMKOVICH**, Chief Judge.

---

Under the federal environmental laws, the owner of property contaminated with hazardous substances or a person who arranges for the disposal of hazardous substances may be strictly liable for subsequent clean-up costs. In this case, the United States owned national forest lands in New Mexico that were mined over several generations by Chevron Mining Inc. The question we must resolve is whether the United States is a "potentially responsible party" (PRP), *see, e.g.*, 42 U.S.C. § 9620(e)(6), for the environmental contamination located on that land.

-2-

We conclude that under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601–75, the United States is an "owner," and, therefore, a PRP, because it is strictly liable for its equitable portion of the costs necessary to remediate the contamination arising from mining activity on federal land. We also conclude in this case that the United States cannot be held liable as an "arranger" of hazardous substance disposal because it did not own or possess the substances in question.

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we therefore reverse the district court in part and affirm in part, and remand for further proceedings to determine the United States's equitable share, if any,[1] of the clean-up costs.

## I. Background

Over the last century, Chevron and its corporate predecessors mined molybdenum at a site near Questa, New Mexico, which we and the parties refer to as the "Questa Site." This extensive mining generated significant amounts of hazardous substances, ultimately triggering costly clean-up requirements. Both before and after the Environmental Protection Agency (EPA)'s 2011 decision to place the Questa Site on the National Priorities List (NPL), *see* 42 U.S.C. § 9605(a)(8), Chevron acknowledged its status as a PRP strictly liable for the

---

[1] Because we remand to the district court to address equitable allocation, *see* 42 U.S.C. § 9613(f)(1), we take no position on whether a party's status as a PRP precludes a determination that its equitable share of response costs is zero.

-3-

hazardous substances contaminating the site. Chevron began remediation measures[2] pursuant to three administrative orders between it and the EPA. These measures are ongoing and projected to continue for decades to come, with anticipated costs exceeding $1 billion. Seeking financial contributions for the clean-up, Chevron filed suit against the United States asking for a declaration that the government is also strictly liable as a PRP—both as an "owner" of portions of the Questa Site and as an "arranger" of hazardous substance disposal, *see* 42 U.S.C. § 9607(a)—for its equitable share of past, present, and future clean-up costs. *See* 42 U.S.C. § 9613(f)(3)(B).[3]

The particular mining and disposal activities relevant to this appeal are summarized below.

---

[2] Whether and what types of costs are necessary and consistent with the National Contingency Plan (NCP), *see* 42 U.S.C. § 9605, and the distinctions between costs incurred as part of "removal actions" and "remedial action[s]," 42 U.S.C. § 9601(23)–(24), is not relevant for purposes of this appeal. We refer generally to all such clean-up costs incurred or that will be incurred.

[3] "A person who has resolved its liability to the United States or a [s]tate for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement . . . ." *Id.*; *see Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 162–68 (2004) (discussing distinctions between CERCLA's several causes of action). Through the EPA, the United States is a party to the administrative orders. However, when Chevron settled with the EPA, the parties contracted to preserve Chevron's right to pursue these § 9613(f)(3)(B), post-settlement contribution claims against the United States.

## A. *Mining Activities from 1919–2014*

Molybdenum is a valuable mineral used in the production of military-grade steel and other materials. Molybdenum mining activities on the Questa mining lands progressed in three stages: (1) initial underground mining and exploration from 1919 to 1964; (2) open-pit mining from 1964 to 1983; and (3) renewed underground mining from 1983 to 2014.

### 1. *Initial Underground Mining and Exploration (1919–1964)*

In 1919, the R&S Molybdenum Company of Denver opened an underground mine. The mine covered approximately 400 acres of mostly public land on which R&S Molybdenum held unpatented mining claims.[4] The underground mine produced relatively small quantities of molybdenum and associated waste for several decades before R&S Molybdenum deemed its reserves exhausted in the 1950s and underground mining operations effectively ceased.

Meanwhile, Congress passed the Defense Production Act of 1950 (DPA) to "ensure the vitality of the domestic industrial base" to supply necessary "materials and services for the national defense." 50 U.S.C. § 4502(a)(1). To

---

[4] Unpatented mining claims on federal land convey a possessory right to the claim holder for the extraction and development of underlying mineral deposits, but the United States retains title to the lands. Patented lands, however, are owned in title by the claim holder. These lands may include the subsurface estate, the surface estate, or both. *See, e.g.*, *Entek GRB, LLC v. Stull Ranches, LLC*, 763 F.3d 1252, 1253–55 (10th Cir. 2014). The "patent" scheme for mining claims is discussed in greater detail below.

facilitate production of such materials, the DPA authorized a new federal agency within the Department of the Interior, the Defense Mineral Exploration Administration (DMEA). As part of its efforts to encourage exploration and development of necessary materials, including molybdenum, the DMEA provided loans to help finance private companies.

In 1957, R&S Molybdenum's successor-in-interest, the Molybdenum Corporation of America (Molycorp), entered into such a loan agreement with the DMEA. Molycorp and the DMEA executed an Exploration Project Contract, under which the federal government agreed to provide a loan covering up to $255,250 (*i.e.*, half the estimated exploration costs) in exchange for Molycorp's agreement to conduct strategic exploratory mining on the Questa mining lands. Under the contract, all work was subject to government approval. App., Vol. 1, at 100 ("The location, direction, inclination, extent, and methods of sampling the work under the contract are subject to Government approval."). Molycorp also agreed to repay the loan in the form of production royalties, provide monthly progress reports, and consult with and inform the government on all phases of the work as it progressed. At this point, Molycorp held twenty-one mining claims near Questa, all but two of which were unpatented.

Pursuant to the DMEA exploration contract, Molycorp conducted extensive exploration from 1957 to 1960 and eventually discovered a molybdenum ore

deposit estimated to be 260 million tons in size. The Department of the Interior certified the discovery in 1960 and Molycorp began mining preparations.

### 2. Open-Pit Mining (1964–1983)

In 1964, Molycorp opened an open-pit mine to extract molybdenum from the ore deposit. The mine was a success and, at full capacity, produced more than four million tons of molybdenum annually (while simultaneously generating significant amounts of waste). By 1966, Molycorp fully repaid the government's loan under the DMEA contract via royalties from mineral production and sales. Molycorp expanded its mining activities to adjacent lands (not covered by the initial federal contract) on which it held mostly unpatented mining claims.

### 3. Renewed Underground Mining (1983–2014)

In 1983, Molycorp ceased open-pit mining operations and opened a new underground mine. Union Oil Company of California acquired the mine and, in 2005, Chevron acquired Union Oil. After several years with little or no mineral production, Chevron closed the underground mine in 2014.

### B. Waste and Associated Disposal

The mining activities produced corresponding amounts of waste containing hazardous substances, now subject to CERCLA remediation. Approximately 150 thousand tons of waste rock were generated from the early underground mining

operations, 328 million tons of waste rock and 75 million tons of "tailings"[5] from the open-pit mining, and 25 million tons of tailings from the renewed underground mining.

The substantial amount of waste generated by these mining activities was not unexpected. When Molycorp first discovered the molybdenum ore deposit in 1960, for example, government engineers produced a "Final Geological and Engineering Report" estimating over 99% of the material extracted from the 260 million ton ore deposit would need to be discarded as waste. *See* App., Vol. 3, at 681–84. Nonetheless, the federal government actively encouraged—and, indeed, funded—Molycorp's mining activities at this site.

Hazardous substance disposal from the mines can be divided into two categories: (1) waste rock disposal; and (2) mine tailings disposal.

### 1. *Waste Rock Disposal*

Chevron and its corporate predecessors disposed of over 328 million tons of waste rock on land surrounding the open-pit mine. Although Molycorp initially held only unpatented mining claims on the these lands, it eventually acquired fee title to 2,258 acres of national forest land around the perimeter of its open-pit mine (referred to as "the selected lands") from the United States.[6] In

---

[5] Mine tailings are fine grains of mining rock and water generated during the milling process as molybdenum is separated from the mined ore.

[6] The parties dispute whether Molycorp could have patented its claims on
(continued...)

exchange for the selected lands, Molycorp traded to the United States approximately 246 acres of private land usable for public recreation, hunting, or other forest purposes. This land exchange was finalized in 1974.

### 2. Mine Tailings Disposal

Chevron and its corporate predecessors also disposed of over 100 million tons of mine tailings by transporting the tailings via pipelines to one of two different "tailings ponds"[7] approximately nine miles away from the open-pit mine. Of the two tailings ponds, the first was located on approximately 627 acres of land acquired from the Bureau of Land Management (BLM) in 1966. The second pond was located on 439 acres of land acquired from the State of New Mexico in 1968. Between 1965 and 1973, Molycorp sought and received several "special use" land authorization permits from the Forest Service for multiple tailings pipelines, which crossed over 4.27 miles of national forest lands to reach the two tailings ponds.

---

[6](...continued)
the selected lands. Chevron contends the selected lands were nonmineral in character and thus unpatentable, while the government suggests Molycorp could have patented the claims. Resolution of this dispute is ultimately irrelevant, however, because regardless of whether Molycorp *could have* acquired title by patenting the claims, it is undisputed that Molycorp *in fact* acquired title through the land exchange. As we explain, this land exchange highlights both the government's ownership (and active exercise of such) over relevant portions of the Questa mining lands during the time of hazardous substance disposal and also evinces the government's assistance in arranging such disposal.

[7] Tailings ponds are confined areas to hold mine tailings.

## II. Analysis

Chevron seeks recognition of the United States as a PRP, both as an "owner" and "arranger," liable for its equitable portion of costs to remediate the hazardous substances located at the Questa Site. These are questions of law that we review de novo in light of the factual record presented in the parties' cross-motions for summary judgment, a record which is not in dispute and our review of which is also de novo. *See Universal Underwriters Ins. Co. v. Winton*, 818 F.3d 1103, 1105 (10th Cir. 2016); Fed. R. Civ. P. 56(a). For the reasons set forth below, we conclude the United States is a PRP as an owner, but not as an arranger.

We start with the relevant statutory background.

### A. Statutory Background: CERCLA and the General Mining Act of 1872

#### 1. CERCLA

CERCLA was designed "to promote the 'timely cleanup of hazardous waste sites' and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. v. United States*, 556 U.S. 599, 602 (2009) (citation omitted). "The remedy that Congress felt it needed in CERCLA is sweeping: *everyone* who is potentially responsible for hazardous-waste contamination may be forced to contribute to the costs of cleanup." *United States v. Bestfoods*, 524 U.S. 51, 56 n.1 (1998) (citation omitted). "[B]ecause CERCLA is remedial legislation, it should be construed

-10-

liberally to carry out its purpose." *Atl. Richfield Co. v. Am. Airlines, Inc.*, 98 F.3d 564, 570 (10th Cir. 1996).

Proving that a defendant is liable in a contribution action under § 9613(f)(3)(B) "is dependent on the establishment of a prima facie case of liability under [§ 9607(a)]." *Morrison Enters. v. McShares, Inc.*, 302 F.3d 1127, 1132 (10th Cir. 2002) (alteration in original) (citation omitted). To do so, "a plaintiff must prove [that] (1) the site is a facility, (2) [the] defendant is a [PRP], (3) the release or threatened release of a hazardous substance has occurred, *and* (4) the release or threatened release caused the plaintiff to incur necessary response costs consistent with the" NCP. *Young v. United States*, 394 F.3d 858, 862 (10th Cir. 2005); *see Morrison*, 302 F.3d at 1135–36 (similarly identifying these elements, but recognizing that the fourth is comprised of three sub-elements). It is undisputed that the Questa Site has released or threatened to release hazardous substances, and that Chevron has incurred necessary response costs consistent with the NCP, pursuant to the administrative orders between Chevron and the EPA. In this case, therefore, only the definition of the relevant facility and the United States's status as a PRP as regards that facility bear on whether it is liable to contribute an equitably allocated amount toward Chevron's incurred and future response costs. We first address the relevant facility and then devote the balance of our analysis to whether the United States is a PRP.

CERCLA authorizes the President to designate certain facilities for

remediation by placement on the NPL. 42 U.S.C. § 9605. And CERCLA defines "facility" broadly to include not only "any building, structure, installation, equipment, pipe or pipeline . . . , well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft," but also "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9).

Under this "broad and detailed definition," *Bestfoods*, 524 U.S. at 56, moreover, for purposes of establishing liability (as opposed to equitable allocation), a person is liable if that person meets CERCLA's definition of a PRP with respect to even a "portion of the total facility." *See Burlington N. & Santa Fe Ry.*, 556 U.S. at 618. In assessing whether the United States is liable here, therefore, we treat the entire EPA-delineated Questa Site as a single facility, even though it also might be conceptualized as numerous distinct parcels of land, sites, or areas, and the contaminated natural formations and objects on or in them. *See* 42 U.S.C. § 9601(9). The Questa Site includes "the mine and waste rock disposal area," "the tailings disposal area," App., Vol. 4, at 908, "as well as all other areas where any hazardous substance, pollutant, or contaminant from [Chevron's] mining, milling, and tailings disposal operations has come to be located." App., Vol. 2, at 249. The Questa Site thus encompasses all of the surface estates that are central to the dispute over whether the United States was an owner of the site.

Turning to whether the United States is a PRP, and regardless of whether a

-12-

facility lands on the NPL, CERCLA holds "covered persons"—*i.e.*, persons[8] liable

for a release or threatened release of hazardous substances from the

facility—strictly liable for remedial action and other necessary response costs. 42

U.S.C. § 9607(a)(4). There are four types of covered persons: (1) owners; (2)

operators; (3) arrangers; and (4) transporters. 42 U.S.C. § 9607(a). These

categories of covered persons, the "potentially responsible parties," are broad.

*See United States v. Atl. Research Corp.*, 551 U.S. 128, 134 & n.2 (2007)

("CERCLA § 107(a) lists four broad categories of persons as PRPs, by definition

liable to other persons for various costs."); *Pub. Serv. Co. of Colo. v. Gates

Rubber Co.*, 175 F.3d 1177, 1181 & n.6 (10th Cir. 1999) ("The categories of PRPs

broadly include current and former owners and operators of a facility or vessel

involved in hazardous substance disposal and persons who arranged for or

accepted hazardous substances for disposal or transportation."). Only the first

and third categories of covered persons—owners and arrangers—are at issue in

this appeal. Each is discussed in greater length below.

"CERCLA liability may be inferred from the totality of the circumstances;

it need not be proven by direct evidence." *Tosco Corp. v. Koch Indus., Inc.*, 216

_____

[8] The term "person" includes "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, [s]tate, municipality, commission, political subdivision of a [s]tate, or any interstate body." 42 U.S.C. § 9601(21).

F.3d 886, 892 (10th Cir. 2000). This is particularly true for cases involving older hazardous substance disposal, "as eyewitness testimony or other direct evidence concerning specific waste disposal practices . . . during the 1940s—well before the enactment of environmental laws—is rarely available." *Id.* "[C]ircumstantial evidence showing disposals of hazardous waste occurred at the [facility] during [a party]'s ownership or operation" of that facility is sufficient, if credited by the factfinder, to trigger liability. *Id.* Such otherwise-covered persons may avoid liability only if they qualify for one of CERCLA's enumerated defenses, e.g., those set forth in 42 U.S.C. § 9607(b), none of which is asserted here. Moreover, again, the factual record is not in dispute, allowing us to definitively resolve whether the United States is a PRP as a matter of law.

Finally, under the contribution provision of CERCLA at issue here, § 9613(f)(3)(B), all PRPs are jointly liable, and the court "may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1); *see Burlington N. & Santa Fe Ry.*, 556 U.S. at 613–15 (discussing CERCLA's various costs-shifting frameworks). CERCLA subjects the United States to this statutory scheme "in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9607. . . ." 42 U.S.C. § 9620(a)(1); *see, e.g.*, 42 U.S.C. § 9620(e)(6) (permitting the EPA to settle with another PRP to remediate a "Federal facility," giving rise to a contribution claim against the United States).

-14-

## 2. The General Mining Act of 1872

Chevron's claims arose from its right to exploit mineral deposits under the public lands of the United States.  Under the General Mining Act of 1872, "all valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States."  30 U.S.C. § 22.  In essence, the Act "provides that citizens may enter and explore the public domain, and search for minerals; if they discover 'valuable mineral deposits,' they may obtain title to the land on which such deposits are located."  *Andrus v. Shell Oil Co.*, 446 U.S. 657, 658 (1980).

Locators of mining claims, "so long as they comply with the laws of the United States, and with [s]tate, territorial, and local regulations . . . , shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations."  30 U.S.C. § 26.

> A mining claim is a parcel of land containing precious metal in its soil or rock.  A location is the act of appropriating such parcel, according to certain established rules.  It usually consists in placing on the ground, in a conspicuous position, a notice setting forth the name of the locator, the fact that it is taken or located, with the requisite description of the extent and boundaries of the parcel, according to the local customs, or, since the statute of 1872, according to the provisions of that act.

*Smelting Co. v. Kemp*, 104 U.S. 636, 649 (1881).  Under the General Mining Act of 1872, citizens may take steps to "locate" their mining claims by, at a minimum:

-15-

(1) distinctly marking the location on the ground so that its boundaries can be readily traced; (2) recording and submitting the name or names of the locators, the date of the location, and such a description of the claim or claims located by reference to some natural object or permanent monument as will identify the claim; and (3) maintaining the claim by annually performing at least $100 worth of labor or improvements, or paying a claim maintenance fee. *See* 30 U.S.C. §§ 28, 28f.

Citizens may also seek to convert their general, "unpatented" mining claims into "patented" claims by following the process set forth in 30 U.S.C. § 29. The holder of an unpatented claim has superior rights as against third parties but not as against the United States, which retains paramount title. *See United States v. Etcheverry*, 230 F.2d 193, 195 (10th Cir. 1956) ("[T]he mere location of a mining claim gives to the locator only the right to explore for and mine minerals, and to purchase the land if there has been a compliance with the provisions of the statute. As against third parties, the locator or his assigns have exclusive right to use the surface of this land, but as against the United States, his right is conditional and inchoate." (citing *Shiver v. United States*, 159 U.S. 491 (1895))). Issuance of a patent transfers title in the underlying public land from the United States to the patent holder. *See, e.g.*, *Iron Silver Mining Co. v. Campbell*, 135 U.S. 286, 301 (1890) ("[W]hen the government has issued and delivered its patent for lands of the United States, the control of the department over the title to such

land has ceased."); *Smelting Co.*, 104 U.S. at 640–41 (1881) ("The execution and record of the patent are the final acts of the officers of the government for the transfer of its title, and as they can be lawfully performed only after certain steps have been taken, that instrument . . . not merely operates to pass the title, but is in the nature of an official declaration by that branch of government to which the alienation of the public lands, under the law, is intrusted, that all the requirements preliminary to its issue have been complied with.").

Nonmineral lands, however, may only be patented if the property is less than five acres and is included in a patent application for land with valuable minerals (subject to the same survey and notice requirements set forth in 30 U.S.C. § 29). *See* 30 U.S.C. § 42.

Given the legal background, this case requires us to harmonize liability provisions under CERCLA with the rights created by the General Mining Act of 1872 to determine whether the United States is a PRP and therefore required to equitably contribute toward cleaning up hazardous substances from mining operations on or under such land. We address owner liability first, and then turn to arranger liability.

### B. *"Owner" Liability*

Chevron seeks recognition of the United States as an "owner" strictly liable for hazardous substances on the Questa mining lands. As we explain, we agree

-17-

that the United States qualifies as a PRP because it owned portions of the land comprising the Questa Site. *See Burlington N. & Santa Fe Ry.*, 556 U.S. at 618.

Owner liability attaches to "any person owning" the contaminated facility. *See* 42 U.S.C. § 9601(20)(A); *Bestfoods*, 524 U.S. at 68 (explaining that the PRP inquiry "rests on the relationship between" the defendant and the "facility itself"); *Morrison*, 302 F.3d at 1133 ("Because liability is strict," a plaintiff "need not show that the defendant caused the release of hazardous wastes that required response actions."). Both current and past owners are subject to owner liability—it reaches "any person who at the time of disposal of any hazardous substance owned . . . any facility at which such hazardous substances were disposed of[.]" 42 U.S.C. § 9607(a).

The ordinary or natural meaning of "owner" includes, at a minimum, a legal title holder. *See Own*, Black's Law Dictionary (10th ed. 2014) ("To rightfully have or possess as property; to have legal title to."); *Owner*, Black's Law Dictionary (10th ed. 2014) ("Someone who has the right to possess, use, and convey something; a person in whom one or more interests are vested. An owner may have complete property in the thing or may have parted with some interests in it (as by granting an easement or making a lease).").

Dictionaries published around the time of CERCLA's enactment in 1980 affirm this natural meaning. *See Ownership*, American Heritage Dictionary (2d. ed. 1982) ("The state or fact of being an owner. . . . Legal right to the possession

-18-

of a thing."); *Owner*, Oxford American Dictionary (1st ed. 1980) ("[A] person who owns something as his property."); *Own*, Black's Law Dictionary (5th ed. 1979) ("To have good legal title; to hold as property; to have a legal or rightful title to; to have; to possess."); *Owner*, Black's Law Dictionary (5th ed. 1979) ("The person in whom is vested the ownership, dominion, or title of property; proprietor. He who has dominion of a thing, . . . which he has a right to enjoy and do with as he pleases, even to spoil or destroy it, as far as the law permits, unless he be prevented by some agreement or covenant which restraints his right. . . . The primary meaning of the word as applied to land is one who owns the fee and who has the right to dispose of the property, but the term also includes one having a possessory right to land or the person occupying or cultivating it."). For purposes of CERCLA, then, an owner includes the legal title holder of contaminated land.[9] This broad liability is limited by only a handful of enumerated exceptions, which, again, the United States does not assert here.[10]

---

[9] As the government points out, the statutory language is circular, in effect, a "tautology," because it defines an owner as an owner. *See Bestfoods*, 524 U.S. at 56. That may be true but as we discuss below, in context, the language still yields its ordinary meaning—an owner includes the title holder. To the extent a statutory definition is, by itself, circular or "useless[ ]," we are left "to do the best we can to give the term its 'ordinary or natural meaning.'" *See id.* at 66.

[10] *See, e.g.*, 42 U.S.C. §§ 9601(20)(A) (person holding indicia of ownership primarily to protect his security interest), 9601(20)(D) (a unit of state or local government that acquired ownership or control involuntarily by virtue of its function as sovereign—*e.g.*, through bankruptcy, tax delinquency, or abandonment), 9601(20)(E)(i) (lender holding indicia of ownership primarily to

(continued...)

-19-

If the statutory term were not clear enough, the Supreme Court has admonished that "the law of CERCLA liability" incorporates "traditional standards and expectations," that a "CERCLA-specific rule of . . . liability . . . does not arise from congressional silence," and, rather, that "CERCLA's silence is dispositive." *Bestfoods*, 524 U.S. at 70. "It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (citation omitted). Under this "rudimentary canon of statutory construction that [ ] superfluities are to be avoided," *Lockheed Martin Corp. v. Admin. Review Bd.*, 717 F.3d 1121, 1130 (10th Cir. 2013), we turn to contextual clues about the meaning of the term "owner." Other CERCLA provisions shed light on this inquiry. For example, among minimum standards for responding to a hazardous substance release, CERCLA requires "a method for and assignment of responsibility for reporting the existence of such facilities which may be located on *federally owned or controlled properties* and any releases of hazardous substances from such facilities." 42 U.S.C. § 9605(a)(6) (emphasis added).

_____

[10](...continued)
protect his security interest), 9601(20)(E)(ii) (lender that did not participate in management prior to foreclosure), 9607 (owners of contiguous real property who establish certain conditions by a preponderance of the evidence), 9624 (owners of equipment unless they caused the release or are otherwise liable).

The distinction between *federally owned* and *federally controlled* properties indicates that ownership and control are independent inquiries—the United States may own a facility without controlling that facility. *Cf.* 42 U.S.C. § 9620(a)(1) ("[T]he United States . . . shall be subject to, and comply with, this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9607 of this title."). CERCLA also provides, at the request of a state, that the President "generally shall defer" final listing of an eligible site on the NPL if the President determines certain conditions have been satisfied. *See* 42 U.S.C. § 9605(h)(1). But the President "may decline to defer, or elect to discontinue a deferral" if the President determines "deferral would not be appropriate because the [s]tate, *as an owner or operator or a significant contributor* of hazardous substances to the facility, is a potentially responsible party." 42 U.S.C. § 9605(h)(4)(A) (emphasis added).

Differentiating among *owners*, *operators*, and *significant contributors* demonstrates that a person may be considered an owner for purposes of CERCLA liability, *see Bestfoods*, 524 U.S. at 56 n.1, without having contributed in any way to the hazardous substances. *See Atl. Research Corp.*, 551 U.S. at 136 ("[CERCLA] defines PRPs so broadly as to sweep in virtually all persons likely to incur cleanup costs. . . . [E]ven parties not responsible for contamination may fall within the broad definitions of PRPs in [§ 9607(a)]."). Likewise, CERCLA contains provisions for expedited final settlement with PRPs in certain

-21-

circumstances. *See* 42 U.S.C. § 9622(g)(1). Expedited final settlement may be appropriate when the PRP "(i) is the *owner* of the real property on or in which the facility is located; (ii) did not *conduct or permit* the generation, transportation, storage, treatment, or disposal of any hazardous substance at the facility; and (3) did not *contribute* to the release or threat of release of a hazardous substance at the facility through any action or omission." 42 U.S.C. § 9622(g)(1)(B) (emphasis added). These three, distinct, enumerated requirements indicate that they are separate—*i.e.*, an owner of real property on or in which the facility is located does not have to have conducted, permitted, or contributed to the production of hazardous substances in order to be considered an owner for purposes of CERCLA liability. Interpreting these provisions to mean otherwise would render portions of the statute superfluous, void, or insignificant.

It is undisputed that the United States held legal title to relevant portions of the Questa mining lands at the time of significant hazardous substance disposal. *See, e.g.*, App., Vol. 2, at 422 ("Prior to approving the 1974 Land Exchange, United States employees knew that [Chevron] had disposed of waste rock on the Selected Lands covered by [Chevron's] unpatented mining claims . . . ."). Nevertheless, the government argues "bare legal title" is insufficient to trigger owner liability. Instead, it contends the unique nature of unpatented mining claims on federal lands requires an exception to CERCLA's ownership liability provision. *But see* 42 U.S.C. § 9620(a)(1) (holding "the United States" liable "to

the same extent, both procedurally and substantively, as any nongovernmental entity, including" as regards "liability under" 42 U.S.C. § 9607(a)(2)'s "owner or operator" provision).

Although CERLCA contains neither an expressed nor an implied exception to owner liability for holders of "bare legal title," the government urges us to adopt such an exception based on *United States v. Friedland*, 152 F. Supp. 2d 1234 (D. Colo. 2001). In *Friedland*, the district court held the United States, as "bare legal title holder to unpatented mining claims," did not qualify as an "owner" for purposes of CERCLA liability. *See* 152 F. Supp. 2d at 1242–46. In reaching this conclusion, however, *Friedland* found that, because CERCLA defines owner "tautologically . . . as 'any person . . . owning a facility,'" "CERCLA's text [ ] offers virtually no guidance in interpreting the extent of owner liability." *Id.* at 1242 (quoting 42 U.S.C. § 9601(20)(A)). And *Friedland* agreed with the Second Circuit's finding in *Commander Oil* that "the term 'owner' has no natural meaning" and "limited inherent content." *See Friedland*, 152 F. Supp. 2d at 1242 (citing *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 327–28 (2d Cir. 2001)). To fill this void, the district court adopted an "indicia of ownership" analysis which required examining "the relationship between the United States, as owner of bare legal title of the unpatented mining claim/property, and those entities utilizing the property subject to the unpatented mining claim," to discern "whether the United States possessed indicia of

-23-

ownership sufficient to merit the appellation 'owner' for purposes of CERCLA."

*Id.* at 1244. Conducting this analysis, *Friedland* found "the United States [was]

not an 'owner' in the fullest sense of the term," so it was "inappropriate to deem

the United States an 'owner' for purposes of CERCLA liability." *Id.* at 1246.

The government urges us to adopt *Friedland*'s indicia of ownership test.

But we find it neither persuasive in principle nor in application. First, as we

explained above, this analysis has no basis in the statute. In fact, CERCLA's

statutory context, which supports broad application of owner liability subject only

to certain, specifically enumerated exceptions belies a supra-statutory gloss.

Moreover, Congress included the phrase "indicia of ownership" when crafting

some of its few exceptions to broad owner liability. *See, e.g.*, 42 U.S.C.

§§ 9601(20)(A) (person holding indicia of ownership primarily to protect his

security interest), 9601(20)(E)(i) (lender holding indicia of ownership primarily

to protect his security interest). If Congress sought to require indicia of

ownership by all would-be "owners," it could have done so. The indicia of

ownership test also runs perilously close to collapsing the "owner" and "operator"

categories by requiring owners to exercise some threshold level of indicia of

ownership beyond their rights as title holder. *See Atl. Research*, 551 U.S. at 136

(noting that even "'innocent private parties," e.g., "a landowner whose land has

been contaminated by another," are within the ambit of this "strict liability

statute" (absent a statutorily-enumerated defense), because "even parties not

-24-

responsible for contamination may fall within the broad definitions of PRPs" (citation omitted)).

Second, at least some of *Friedland*'s reasoning conflicts with, and is thus undermined by, binding Supreme Court precedent. While *Friedland* contends "the United States is not allowed to exclude individuals from [land subject to unpatented mining claims] and may only regulate mining activities in the national forests in order to protect surface resources," *see* 152 F. Supp. 2d at 1246, the Supreme Court has repeatedly emphasized Congress's broad, plenary Property Clause[11] powers over national forest land, including lands subject to unpatented mining claims. *See, e.g.*, *Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 581 (1987) ("[T]he Property Clause gives Congress plenary power to legislate the use of the federal land on which [a mining company] holds its unpatented mining claim.").[12] Even if it is true, as the government argues, that

_____

[11] U.S. Const. art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . .").

[12] *See also, e.g.*, *United States v. Locke*, 471 U.S. 84, 104 (1985) ("Although owners of unpatented mining claims hold fully recognized possessory interests in their claims, we have recognized that these interests are a 'unique form of property.' The United States, as owner of the underlying fee title to the public domain, maintains broad powers over the terms and conditions upon which the public lands can be used, leased, and acquired. . . . Claimants thus must take their interests with the knowledge that the Government retains substantial regulatory power over those interests." (citation omitted)); *Best v. Humboldt Placer Mining Co.*, 371 U.S. 334, 336 (1963) ("Respondents' mining claims are unpatented, the title to the lands in controversy still being in the United

(continued...)

Chevron and its corporate predecessors "had exclusive use and possession of the [Questa mining lands] for mining purposes, without any interference or control by the United States," Aple. Br. at 21, the government's choice not to exercise its Property Clause powers does not invalidate their existence. There is no dispute that the United States held fee title to relevant portions of the Questa mining lands during the time of hazardous substance disposal, part of the area that today comprises the Questa Site. We do not doubt that it could have exercised greater powers, regulatory or otherwise, over the lands if it wanted to do so.[13]

---

[12](...continued)
States. . . . [T]he Department has been granted plenary authority over the administration of public lands, including mineral lands; and it has been given broad authority to issue regulations concerning them."); *Belk v. Meagher*, 104 U.S. 279, 283–84 (1881) ("Congress has seen fit to make the possession of that part of the public lands which is valuable for minerals separable from the fee, and to provide for the existence of an exclusive right to the possession, while the paramount title to the land remains in the United States. . . . The right of location upon the mineral lands of the United States is a privilege granted by Congress, but it can only be exercised within the limits prescribed by the grant.").

[13] Under the Property Clause, Congress always retains—at least over the "lands of the United States"—the powers "to control their occupancy and use, to protect them from trespass and injury, and to prescribe the conditions upon which others may obtain rights in them." *Utah Power & Light Co. v. United States*, 243 U.S. 389, 405 (1917). This "power over the public land . . . entrusted to Congress is without limitations." *Alabama v. Texas*, 347 U.S. 272, 273 (1954); *see also United States v. Bd. of Cty. Comm'rs of Cty. of Otero*, 843 F.3d 1208, 1212 (10th Cir. 2016) ("[T]he Property Clause gives the federal government plenary power, including legislative and police power, over federal property."). And, as we have explained, the Supreme Court has made clear that while holders of unpatented mining claims have substantial property interests in their claims, Congress's broad, plenary Property Clause powers continue to reach the underlying federal land.

Finally, we find the government's argument undermines the understanding of what a CERCLA "facility" is. CERCLA defines "facility" to broadly include "any site or area" (*i.e.*, land) "where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9). Its statutory coverage is expressly *not* limited to a "facility" in the more traditional, narrow sense—*e.g.*, "any building, structure, installation, equipment, pipe or pipeline . . . , well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft." *Id.* An owner of any land contaminated with hazardous substances thus qualifies as an owner of a "facility," even if that person does not own any of the mining equipment or structures. In contrast to this clear statutory command, the government asks us to define "the facility" solely "with respect to Chevron's mining activities," and not with respect to the land, such that "any non-mining use rights held by the United States within the boundaries of Chevron's mining claims are not part of the 'bundle of sticks' that is material to determining whether the United States is an 'owner' of the Questa Mine 'facility.'" Aple. Br. at 42.

We conclude that, at a minimum, the term "owner" covers fee title holders for purposes of CERCLA liability, irrespective of any additional indicia of ownership. To find otherwise would be inconsistent with CERCLA's statutory scheme and an ordinary application of its terms. Of course, a "bare legal title" holder may in fact be liable for only a small, or perhaps no, share of remediation

-27-

costs as a matter of equity. But a liberal construction of CERCLA's liability scheme requires any consideration of the extent and kind of an owner's involvement in hazardous substance production and disposal be made at the second stage of the CERCLA liability inquiry (*i.e.*, allocation under 42 U.S.C. § 9613(f)(1)), rather than the first (*i.e.*, precluding "owner" liability entirely). This position is consistent with Supreme Court precedent and case law from other circuits.[14] *See Atl. Research*, 551 U.S. at 136 (explaining that "even parties not responsible for contamination may fall within the broad definition of PRPs," e.g., owners).

---

[14] For example, the Fourth Circuit has addressed, and rejected, the argument that a person who merely "held legal title to the property for only a short period of time" was not an "owner" for purposes of CERCLA liability. *See Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 844 (4th Cir. 1992). In holding the short-term title holder liable as an owner, the court noted that "the word 'owned' is [not] a word that admits of varying degrees. Such equitable considerations as the duration of ownership may well be relevant at a later stage of the proceedings when the district court allocates response costs among liable parties, but we reject any suggestion that a short-term owner is somehow not an owner for purposes of § 9607(a)(2)." *Id.* (citation omitted); *see also, e.g., Los Angeles v. San Pedro Boat Works*, 635 F.3d 440, 444, 448–52 (9th Cir. 2011) (acknowledging "Congress's intent to hold liable the *passive fee title owner of real property*," declining to apply *Commander Oil*'s "nebulous and flexible" framework, and, in holding owner liability improper as applied to holders of revocable permits for specific use of real property, contrasting the status of persons holding "less-than fee-title possessory interests in real property, conveyed by the holder of fee title" with persons holding "absolute title ownership to real property" (*i.e.*, quintessential "owners") (emphasis added)); *Canadyne-Ga. Corp. v. NationsBank, N.A. (S.)*, 183 F.3d 1268, 1273–74 (11th Cir. 1999) (finding "legal title" sufficient to trigger owner liability).

In any event, the government engaged in much more than mere passive ownership here. The United States actively exercised its ownership when, for example, it sold portions of its land, including the 2,258 acres of land for waste rock disposal around the perimeter of the open-pit mine and the 627 acres of land for use as a tailings pond, to Molycorp in exchange for valuable consideration. Alienability is a key tenant of ownership—it is a "fundamental maxim of property law that the owner of a property interest may dispose of all or part of that interest as he sees fit." *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 167 (1998).

In addition, the government actively encouraged mining activities on its lands when it passed the DPA and provided the initial loan to Molycorp, Chevron's corporate predecessor, to fund their molybdenum exploration and mining. For decades after that, the United States knew that Chevron was depositing millions of tons of waste rock and tailings on the surface estates, land over which the United States still held, at minimum, ownership via legal title. Regardless of whether contracting out mining activities might, or might not, shield a party from *operator* liability, it cannot shield a landowner—here, the legal titleholder—from *owner* liability (although it might reduce the party's equitable share at the allocation stage). And the government repeatedly exercised its plenary regulatory authority over the lands when it approved several special use permits for Molycorp's tailings pipelines. These actions all indicate the government's continued oversight and involvement in operations on the Questa

mining lands that produced substantial amounts of hazardous substances.  Though

such efforts are not at all required for ownership liability, *see, e.g.*, *Atl. Research*,

551 U.S. at 136, that the United States undertook them here buttresses our

conclusion that it was an owner.

Accordingly, we conclude the United States was an owner of portions of

the Questa Site during the relevant period when hazardous substances came to be

located there.  As a matter of law, therefore, the United States is a PRP with

respect to the Questa Site and is strictly liable to contribute its equitably allocated

share of Chevron's response costs, pursuant to § 9613(f)(3)(B).

### C.  *"Arranger" Liability*

In addition to liability as an "owner" of contaminated property, Chevron

asks us to find the United States liable as an "arranger" of hazardous substance

disposal at the Questa Site.  Though we have already determined the United

States qualifies as an owner and is therefore a PRP, we must address this separate

theory of recovery under § 9613(f)(3)(B) because it may affect the determination

of the United State's equitable allocation of the response costs.  As we explain,

however, we conclude that the United States is not liable as an arranger under

CERCLA because it neither owned nor possessed the hazardous substances

disposed of.

Arranger liability under CERCLA attaches to,

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances.

42 U.S.C. § 9607(a)(3). In other words, to be held liable under CERCLA as an arranger, we require a party to satisfy three conditions: (1) the party must be a "person" as defined in CERCLA; (2) the party must "own" or "possess" the hazardous substance prior to the disposal; and (3) the party must, "by contract, agreement or otherwise," arrange for the transport or disposal of such hazardous substances. *Raytheon Constructors, Inc. v. Asarco Inc.*, 368 F.3d 1214, 1219 (10th Cir. 2003). Because the United States at best satisfies only two of these three conditions—the first and the third—we hold that arranger liability does not apply.

To begin with, the United States is a "person" as defined in CERCLA, thus satisfying the first condition. *See* 42 U.S.C. § 9601(21) ("The term 'person' means . . . United States Government . . . ."); 42 U.S.C. § 9620(a)(1) ("Each department, agency, and instrumentality of the United States (including the executive, legislative, and judicial branches of government) shall be subject to, and comply with, this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9607 of this title.").

As to the third condition, it is true that the United States helped arrange for the transport or disposal of waste rock and tailings at the Questa Site. And it is undisputed those materials contained or were themselves hazardous substances within the meaning of CERCLA. *See* 42 U.S.C. § 9601(14). But as the Supreme Court has explained, not all involvement in the disposal process triggers arranger liability. While it is "plain from the language of the statute that CERCLA liability would attach under § 9607(a)(3) if an entity were to enter into a transaction for the sole purpose of discarding a used and no longer useful hazardous substance," it is equally clear that, at the other extreme, "an entity could not be held liable as an arranger merely for selling a new and useful product if the purchaser of that product later, and unbeknownst to the seller, disposed of the product in a way that led to contamination." *Burlington N. & Santa Fe Ry.*, 556 U.S. at 609–10. "Less clear is the liability attaching to the many permutations of 'arrangements' that fall between these two extremes." *Id.* at 610.

In such cases, "whether an entity is an arranger requires a fact-intensive inquiry that looks beyond the parties' characterization of the transaction . . . and seeks to discern whether the arrangement was one Congress intended to fall within the scope of CERCLA's strict-liability provisions." *Id.* The Supreme Court has interpreted this inquiry to require more than "knowledge alone"; an arranger must have taken "intentional steps to dispose of a hazardous substance."

-32-

*See id.* at 611–12; *see also Martin K. Eby Constr. Co. v. OneBeacon Ins.*, 777 F.3d 1132, 1140 (10th Cir. 2015) (citing this rule in a state-law insurance case).

Chevron contends that sufficiently intentional steps have been taken to satisfy this requirement. It points to language from *Burlington Northern* that explains "to qualify as an arranger," a party must have entered into an arrangement "with the intention that at least a portion of the product be disposed of during the transfer process by one or more of the methods described in § 6903(3)," *Burlington N. & Santa Fe Ry.*, 556 U.S. at 612, *i.e.*, by discharge, deposit, injection, dumping, spilling, leaking, or placing it into or on any land or water, 42 U.S.C. § 6903(3).

According to Chevron, the undisputed facts demonstrate the federal government intentionally arranged for the disposal of hazardous substances on and from the Questa mining lands. *First*, the United States sold the selected lands to Molycorp with the knowledge that the lands were intended to be used as a disposal area. Molycorp initially proposed to use a canyon across the Red River as its primary waste-disposal site. Although a Forest Service report indicated that the Red River proposal was going to be the "least expensive means of dispos[al], . . . the impact on the environment and ecology of Red River Canyon would be tremendous" and the proposal was thus "vigorously opposed by the Forest Service and ecologist groups." App., Vol. 1, at 167. As an alternative, then, Molycorp began negotiations with the Forest Service in 1969 to facilitate a

transaction in which Molycorp would give the United States "246.65 acres of land which it own[ed] in Taos County" in exchange for "2,258 acres of National Forest land" adjacent to the open-pit mine. *Id.* at 163. The Forest Service shared Molycorp's intent to use the selected lands as a disposal area and believed this use would benefit the United States. *See id.* at 164 ("The selected lands will be the final area of disposal for a part of the nonmineral overburden."); *id.* at 166 (acknowledging that "the mine is supplying a needed mineral resource to the Nation" and noting "several indirect benefits from the disposal of the overburden material").

*Second*, the United States sold an additional 627 acres of land to Molycorp with the intent that the lands be used as a tailings pond to dispose of mine tailings. A BLM land report analyzing the proposed sale identified the lands as "non-mineral in character" and "greatly needed as a tailings pond," explaining the government's understanding that Molycorp's "molybdenum mine is located nine miles to the east and tailings would be piped from the mine to the pond." *Id.* at 183–84. The BLM ultimately found that the sale would be "in the public interest" and, "[c]onsidering the urgent need of the applicant for the subject tract and its suitability for the proposed use as well as the resulting economic benefit to the general area from the expanded mining operation, the highest and best use is that of a tailings pond." *Id.* 183, 186.

-34-

*Finally*, the United States routinely approved special use land authorization permits for pipelines crossing over national forest lands with the specific intent that Molycorp would use the pipelines to transport tailings from the mine site to the disposal ponds. For example, a 1965 government Impact Report referred to the pipeline as a "proposed tailings line" and acknowledged specific risks associated with this particular use, including "the potential of the line breaking and spilling slurry into the river, which might result in local fish kill prior to repair of the line." *Id.* at 204–05. The report nonetheless concluded "[t]he over-all impact of this project . . . is beneficial," *id.* at 205, and indicated an express preference for Molycorp's pipeline plan. It did so to avoid "[t]he alternative of a mountain of tailings in the canyon around Sulfer Gulch," which would be "intolerable but legal." *See id.* at 205. And the government had no doubt that subsequent special use permits would likewise allow construction of pipelines to transport mine tailings. A 1973 letter to Molycorp approved "a fourth tailings line adjacent to [its] existing tailings pipeline." *Id.* at 208.

These government actions may well constitute sufficiently "intentional steps" to satisfy the third condition of arranger liability. The collective effect of the United States's actions—including the sale of the selected lands for a waste disposal site, sale of the land for the second tailings pond, and approval of the tailings pipelines—was not only to ensure the likelihood of hazardous substance disposal but also to facilitate it.

-35-

But that is not the end of our analysis. Arranger liability under CERCLA applies only to a person who arranges for disposal "of hazardous substances *owned or possessed by such person*." 42 U.S.C. § 9607(a)(3) (emphasis added). As we said in *Raytheon*, to be held liable under CERCLA as an arranger, "the party . . . must 'own' or 'possess' the hazardous substance at issue." 368 F.3d at 1219. Chevron suggests we revisit the ownership/possession requirement in its entirety. But, "[a]bsent *en banc* consideration, we generally 'cannot overturn the decision of another panel of this court,'" unless an intervening Supreme Court decision "is 'contrary' to or 'invalidates our previous analysis.'" *See United States v. Brooks*, 751 F.3d 1204, 1209 (10th Cir. 2014) (citations omitted). And although Chevron implies the Supreme Court's decision in *Burlington Northern* invalidated our explanation of CERCLA's ownership requirement set forth in *Raytheon*, we are not persuaded. Beyond reproducing the statutory text, *Burlington Northern* does not even mention the ownership requirement in CERCLA's arranger liability provision, let alone call it into question. *See* 556 U.S. at 611–12 (addressing whether a manufacturer that sold chemicals to distributors was an arranger).

Our position is consistent with several cases from other circuits. For example, the First Circuit recognized that the statutory phrase in § 9607(a)(3) "by any other party or entity" could ostensibly be read to modify "the preceding words 'owned or possessed by such person,' which would make liable any person

who arranged for the disposal of a hazardous substance 'owned or possessed by such person [or] by any other party or entity.'" *Am. Cyanamid Co. v. Capuano*, 381 F.3d 6, 23–24  (1st Cir. 2004) (brackets in original).  But the court proceeded to explain the "sentence structure of § 9607(a)(3) makes it clear" that the correct interpretation is to read "by any other party or entity" to modify "the words 'disposal or treatment,' which would make the sentence read 'any person who . . . arranged for disposal or treatment . . . by any other party or entity'" and leave the ownership/possession requirement intact.  *Id.* at 24 (ellipses in original).

Likewise, the Third Circuit agrees that for arranger liability to attach under CERCLA, "[p]roof of ownership, or at least possession, of the hazardous substance is required by the plain language of the statute."  *Morton Int'l, Inc. v. A.E. Staley Mfg. Co.*, 343 F.3d 669, 678 (3d Cir. 2003); *see also, e.g.*, *GenCorp, Inc. v. Olin Corp.*, 390 F.3d 433, 445 (6th Cir. 2004) ("CERCLA imposes liability on any person who 'arrange[s]' 'by contract, agreement or otherwise' for the 'disposal or treatment . . . [or] for transport for disposal or treatment' of *'hazardous substances' that is* [sic] *'owned or possessed' by that person.'"* (emphasis added; brackets and ellipses in original)); *Concrete Sales and Servs., Inc. v. Blue Bird Body Co.*, 211 F.3d 1333, 1337 (11th Cir. 2000) (per curiam) ("In the present case, therefore, the [party seeking imposition of arranger liability] must produce evidence that would allow a reasonable [factfinder] to infer from the totality of the circumstances that [the alleged arrangers] arranged

-37-

for [the] disposal of *hazardous substances owned or possessed by* [*the alleged arrangers*]." (emphasis added)); *Uniroyal Chem. Co., Inc. v. Deltech Corp.*, 160 F.3d 238, 243 (5th Cir. 1998) (quoting 42 U.S.C. § 9607(a)(3) as providing arranger liability for "any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, *of hazardous substances owned or possessed by such person . . .* , at any facility" (emphasis added; ellipses in original)); *United States v. TIC Inv. Corp.*, 68 F.3d 1082, 1086 (8th Cir. 1995) (summarizing 42 U.S.C. § 9607(a)(3) as providing arranger liability for "those who arranged for disposal or treatment, or arranged for transport for disposal or treatment, *of hazardous substances which they owned or possessed*" (emphasis added)).

Chevron points to only one case which has rejected the ownership requirement. *See Cadillac Fairview/Cal., Inc. v. United States*, 41 F.3d 562 (9th Cir. 1994). In that case, the Ninth Circuit interpreted CERCLA's statutory language to extend arranger liability "to persons 'otherwise arrang[ing]' for disposal or treatment of hazardous substances *whether owned by the arranger or* '*by any other party or entity*, at any facility or incineration vessel owned or operated by another party or entity.'" *Id.* at 565 (emphasis added). In other words, *Cadillac Fairview* interpreted arranger liability to attach not only to hazardous substances owned or possessed by the alleged-arranger but also to such substances owned or possessed "by any other party or entity." *Id.* Even if this

-38-

argument were not foreclosed by our decision in *Raytheon*, we find it unpersuasive based on the statute's plain language.

First of all, the more natural reading of the statutory language is that the hazardous substances must be owned or possessed by the person arranging for the disposal or treatment of those substances. In contrast, the clause "by any other party or entity" does not apply to ownership of the hazardous substances but, as most courts have held, refers back to the previous clause, "for disposal or treatment" (*i.e.*, the phrase thus most naturally reads as the arrangement "for disposal or treatment . . . by any other party or entity, at any facility or incineration vessel"). This reading makes sure that the party getting paid for disposal or treatment (and thereby taking possession or ownership of the hazardous substances) is liable while not insulating from liability the previous owner who arranged for the disposal or treatment. To read the provision otherwise would render the "owned or possessed" language entirely superfluous. Under well-established principles of statutory interpretation, Congress would not have included an ownership or possession requirement if that requirement could be met by *any* party's or entity's ownership or possession of the substances.[15] Our correct application of these canons of statutory construction is confirmed by

_____

[15] The canon against surplusage indicates that we generally must give effect to all statutory provisions, so that no part will be inoperative or superfluous—each phrase must have distinct meaning. *See, e.g.*, *Marx v. Gen. Revenue Corp.*, 133 S. Ct. 1166, 1178 (2013); *TRW Inc.*, 534 U.S. at 31; *Lockheed Martin Corp.*, 717 F.3d at 1130–31.

*Cadillac Fairview* itself, which is untethered from CERCLA's text. *See* 41 F.3d at 565.

Chevron also cites two cases, in addition to *Cadillac Fairview*, to support its claim that other courts have rejected an ownership or possession requirement. But as Chevron acknowledges, those cases merely "question[] whether it requires proof of actual ownership, or may be satisfied by other evidence," without rejecting the requirement altogether, *see* Aplt. Reply Br. at 25 n.15. For example, the Sixth Circuit acknowledged that "to say that [42 U.S.C. § 9607(a)(3)] requires ownership or possession of the waste does not establish what evidence will satisfy the requirement or, more particularly, whether constructive ownership or possession will suffice." *GenCorp, Inc.*, 390 F.3d at 448. In interpreting the ownership requirement, *GenCorp* found it appropriate to "infer that Congress meant the phrase 'ownership or possession' to include constructive ownership or possession," and that "GenCorp's control over the hazardous waste suffice[d] to establish constructive ownership and possession" sufficient to trigger arranger liability. *See id.* at 448–49. Likewise, the Eighth Circuit simply declined to require rigid "proof of *personal ownership* or *actual physical possession*." *United States v. Ne. Pharm. & Chem. Co.*, 810 F.2d 726, 743–44 (8th Cir. 1986) (emphasis added). But it found that the company "had actual 'control' over the . . . hazardous substances," and that this authority was sufficient to satisfy the ownership requirement and trigger arranger liability. *See id.* at 743.

*Raytheon* does not discuss whether anything less than actual ownership of the hazardous substances disposed of may satisfy CERCLA's requirements for arranger liability, nor has Chevron made a constructive possession argument. Chevron briefly notes that "the United States held fee title to lands from which waste rock was extracted and therefore owned that rock," but its briefs neither develop this argument nor apply it to CERCLA. *See* Aplt. Br. at 56 n.15.

Even if we were to reach this argument, Chevron failed to establish that the United States owned or possessed the hazardous substances, or the mining waste containing them. It cites to *United States v. McPhilomy*, 270 F.3d 1302 (10th Cir. 2001), but that criminal case did not involve valid mining claims and turned on a very different burden of proof even as to the issues it discussed. In any event, "the moment th[at] ore becomes detached from the soil in which it is embedded it becomes personal property, the ownership of which is in the [person] whose labor, capital, and skill has discovered and developed the mine[,] . . . free from any lien, claim, or title of the United States . . . ." *Forbes v. Gracey*, 94 U.S. 762, 765–66 (1876). The United States neither owned nor possessed the waste rock and tailings extracted from Chevron's molybdenum mining activities.

In sum, we conclude that the United States is not an "arranger" under CERCLA with regard to the contamination located at the Questa Site because it did not own or possess the hazardous substances disposed of.

# III. Conclusion

We conclude that, as a matter of law, the United States is an "owner" under 42 U.S.C. § 9607(a)(2) because it owned portions of the Questa Site at the time hazardous substances were located there. The United States is not, however, an "arranger" under 42 U.S.C. § 9607(a)(3) because it did not own or possess the hazardous substances disposed of. The United States is thus a PRP under CERCLA (as an owner but not an arranger) and, as a matter of law, liable for an equitable allocation of Chevron's past, present, and future necessary response costs to remediate the Questa Site, pursuant to 42 U.S.C. § 9613(f)(3)(B).

Accordingly, we REVERSE in part and AFFIRM in part the district court's judgment and REMAND for further proceedings consistent with this opinion.