FILED
**United States Court of Appeals
Tenth Circuit**

**March 7, 2022**

**Christopher M. Wolpert
Clerk of Court**

<u>**PUBLISH**</u>

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

CYPRUS AMAX MINERALS
COMPANY,

      Plaintiff - Appellee,

v.

TCI PACIFIC COMMUNICATIONS,
LLC, previously named as TCI Pacific
Communications, Inc.,

      Defendant - Appellant.

No. 21-5038

_____

**Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 4:11-CV-00252-CVE-CDL)**

_____

Paul D. Steinman, Cozen O'Connor, Pittsburgh, Pennsylvania, and Paula M. Jantzen,
Ryan Whaley, Oklahoma City, Oklahoma (Mark D. Coldiron, Ryan Whaley, Oklahoma
City, Oklahoma, with them on the briefs), argued for the Appellant.

John F. Stoviak, Saul Ewing Arnstein & Lehr LLP, Philadelphia, Pennsylvania (Michael
F. Smith and Timothy J. Bomhoff, McAfee & Taft, P.C., Tulsa, Oklahoma; Cathleen M.
Devlin and Patrick F. Nugent, Saul Ewing Arnstein & Lehr LLP, Philadelphia,
Pennsylvania, with him on the brief), argued for the Appellee.

_____

Before **CARSON**, **BRISCOE**, and **ROSSMAN**, Circuit Judges.

_____

**BRISCOE**, Circuit Judge.

_____

TCI Pacific Communications, LLC ("TCI") appeals the district court's judgment holding it liable to Cyprus Amax Minerals Co. ("Cyprus") for contribution under 42 U.S.C. §§ 9601(9)(B), 9607(a), and 9613(f) of the Comprehensive Environmental Response and Liability Act ("CERCLA"). The district court granted partial summary judgment to Cyprus and pierced the corporate veil to hold TCI's corporate predecessor, the New Jersey Zinc Company ("NJZ"), liable as the alter ego of the Tulsa Fuel & Manufacturing Co. ("TFMC"). The district court then interpreted CERCLA and held that TCI was liable as a former owner/operator of a CERCLA "facility." The district court had jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 9613(b). This court has jurisdiction under 28 U.S.C. § 1291, and we affirm.

This case involves CERCLA claims brought by Cyprus to determine whether TCI can be held liable for environmental cleanup costs relating to zinc smelting operations near Collinsville, Oklahoma. The Bartlesville Zinc Company, a former subsidiary of Cyprus's predecessor, operated the Bartlesville Zinc Smelter (the "BZ Smelter") from 1911 to 1918, near Collinsville, Oklahoma. TFMC owned and operated another zinc smelter (the "TFM Smelter") from 1911 to 1926. The smelters were located approximately one-quarter mile from each other, just south of Collinsville, Oklahoma. This case does not concern cleanup work at either smelter, but rather is an action by Cyprus seeking cost recovery and contribution for its remediation in the broader Collinsville area, within the Collinsville Soil Program ("CSP") Study Area (the geographic area designated in Figure 1, below). Cyprus

2

seeks to hold TCI liable as a former owner or operator of the TFM Smelter whose waste came to be located throughout the CSP Study Area. The district court ruled for Cyprus, concluding that hazardous substances came to be located at both smelter sites and off-site within the CSP Study Area and that the entire area should be treated as a single facility for the purposes of Cyprus's CERCLA cost recovery and contribution claims.

Figure 1 shows the CSP Study Area and the location of the two smelters in relation to each other and to Collinsville, and Figure 2 shows a closer view of the two smelters, the BZ Smelter to the east and the TFM Smelter, nearly adjacent, to the west. *See* App. Vol. 56 at 3.

*Figure 1*



*Figure 2*



I

The parties do not dispute the general historical facts. In 1906, L.T. McRae, C.A.H. de Saulles, J.T. Price, A.D. Terrell, and G.C. Stebbins incorporated TFMC under the laws of Kansas. McRae and de Saulles were also affiliated with another company NJZ had acquired four years previously. At the time of its incorporation, TFMC had $50,000 in startup capital. It filed annual statements with the State of Kansas every year between its startup and dissolution. At least some of the annual statements were signed and notarized in New York, where NJZ had its corporate offices. TFMC also had a registered agent for service of process and litigated in its own name. The annual statements indicated that TFMC elected officers and had a Board of Directors, and that individuals affiliated with NJZ (but not NJZ itself) owned TFMC's stock. There is evidence of only one TFMC shareholder's meeting, in 1912. At that time, de Saulles was president of TFMC, owned 495 out of TFMC's

500 shares, and sold real property to the company for $1.00. Edgar Palmer replaced de Saulles as TFMC's president in 1912 and served as TFMC's president until its dissolution in 1926. Palmer owned the vast majority of TFMC's stock from at least 1912 to 1926. He was also president of NJZ. Until 1914, TFMC reported up to $586,226 in debt in its annual statements. From 1915 until dissolution, TFMC reported no debt. TFMC's annual statements indicated it made a profit each year of its existence, but its capital account remained at $50,000.

In a 1918 issue of *Zinc* magazine (an internal NJZ newsletter), NJZ's vice president J.E. Hayes discussed NJZ's structure in relation to its subsidiaries. Hayes stated that NJZ's subsidiaries were part of a bigger entity with a single management system, noting that it was necessary to form subsidiaries to operate in some states, but that "the parent company and its lines of organization and routines carry through all the subsidiaries." App. Vol. 17 at 97.

Also in 1918, NJZ made a "War Work" report to the Federal Trade Commission stating that "all material is charged at cost as it passes into the next department." Palmer, then president of both NJZ and TFMC, averred to the War Industries Board that "[a]s the owner of the stock of its subsidiary companies [NJZ] controls their operations, the purchase of all materials and the sale of all products," specifically identifying TFMC as a wholly owned subsidiary of NJZ. *Id.*

In 1921, NJZ filed an informal complaint with the Interstate Commerce Commission ("ICC") relating to freight charges. In 1922, TFMC filed a formal complaint with the ICC relating to the same dispute. A statute of limitations issue

6

arose, which boiled down to whether NJZ, acting as the agent of TFMC, could file an informal complaint on TFMC's behalf.  If the filing by NJZ could be considered as a filing by TFMC, the filing would be timely.

At a hearing before the ICC on May 9, 1923, NJZ put on evidence that it filed the informal complaint on TFMC's behalf and, more generally, that NJZ could act on behalf of its subsidiaries in any matter.  C.H. George, General Traffic Manager of both NJZ and TFMC, testified by reading a prepared statement that the "entire capital stock [of TFMC] is owned by [NJZ]" and that NJZ owned the stock of all subsidiary companies.  *Id.* at 95.  George further testified that NJZ "possesses consequent to that absolute ownership, complete control of all the affairs of its subsidiaries . . . and in fact and in actual practice does exercise complete control in the general conduct of its and their business, and it acts as agent for and in behalf of its subsidiaries."  *Id.*  George went further still, testifying that "lines of authority of [NJZ's] personnel extend to all companies, so that its executives and their staff function without regard to corporate lines of division."  *Id.*  NJZ claimed that its officers acted in the same positions for NJZ and its subsidiaries.  NJZ introduced organizational charts showing that TFMC was a subset of NJZ's manufacturing department.  It also introduced a written statement by George that he was authorized to act for TFMC both as general traffic manager of TFMC and "as general traffic manager of [NJZ] through the authority of the latter to act for the former."  *Id.* at 96.  In supplemental briefing, NJZ doubled down, arguing that it "owns all the capital stock of its subsidiary companies . . . and, consequent to such absolute ownership, possesses complete

7

control of all the affairs of its subsidiaries, and in fact and in actual practice does exercise such complete control in the general conduct of its and their business, and it acts as agent for and in behalf of its subsidiaries." *Id.*

The ICC apparently agreed with NJZ's representations, stating: "We are of opinion that the informal filing [by NJZ] was, in fact, on complainant's [TFMC's] behalf. The record shows that C.H. George, who signed the informal complaint, was also general traffic manager for complainant, with authority to bring complaints before us for and on behalf of complainant." *Tulsa Fuel & Mfg. Co. v. Director General, As Agent, Atchison, Topeka & Santa Fe Ry. Co.*, 98 I.C.C. 411, 413 (1925). The ICC concluded that TFMC was entitled to reparation in the amount of $2,234.97 plus interest.

In 1922, NJZ's president, vice president, general counsel, comptroller, treasurer, general sales manager of ore, and purchasing agent all held the same positions within TFMC. When TFMC was dissolved in 1926, its real property was sold to the Tulsa County Coal Company. NJZ (not individuals affiliated with NJZ) received a $500,000 liquidation dividend as a result of the sale.

TFMC operated the TFM Smelter. Both the TFM and BZ smelters generated many kinds of solid waste, such as broken and spent retorts and condensers, used refractory brick from furnace linings, and retort residue containing coked reducing coal. Residents of the area used byproduct from the TFM Smelter and the BZ Smelter for various residential and construction projects, a common practice at the time. By this means, smelter waste containing a mixture of metals, including zinc,

cadmium, lead, arsenic, and sulfur made its way into the soil of the greater Collinsville area, and the waste from the two smelters is indistinguishable. In other words, hazardous material in any given part of the CSP Study Area could have come from either smelter.

In the early 1990s, the Oklahoma Department of Environmental Quality ("ODEQ") began investigating the BZ Smelter, eventually issuing a report noting the BZ Smelter's proximity to the TFM Smelter and that it was impossible to determine which smelter was responsible for any given contamination. After identifying Cyprus as a potentially responsible party, ODEQ and Cyprus entered into a consent agreement, and Cyprus contracted with a third party to prepare a report, which identified soil contamination as the main environmental concern.

Meanwhile, the Oklahoma State Department of Health began investigating the TFM Smelter. ODEQ determined that nothing had been done to prevent contamination from escaping from the TFM Smelter and that a substantial amount of waste remained at the TFM Smelter itself. The United States Environmental Protection Agency ("EPA") also looked into the TFM Smelter and put it on the Superfund National Priorities List. EPA and ODEQ sought assistance in cleaning up the TFM Smelter and the surrounding area from multiple entities in the Viacom, Inc. corporate family as successors to NJZ and TFMC, but all rebuffed those efforts. EPA and ODEQ entered into an agreement to clean up the TFM Smelter. EPA issued a Record of Decision for the former smelter to cleanup approximately 200,000 cubic

yards of soil and waste on the roughly 60-acre area, and ODEQ carried out those cleanup efforts.

On February 20, 2009, ODEQ issued a document titled "Action Memorandum Collinsville Soil Program" ("CSP Action Memorandum"). The CSP Action Memorandum discussed the need to assess and possibly clean up areas near the two smelters, referring to emissions and transport of materials as contaminant migration pathways.

On May 28, 2009, ODEQ filed a complaint against Cyprus "asserting CERCLA claims for the environmental contamination in Collinsville, Oklahoma (the 'Collinsville Town Site')." App. Vol. 2 at 64; *see also* App. Vol. 19 at 168. Cyprus's CERCLA liability for claims related to the Collinsville Town Site was resolved by entry of a consent decree on July 21, 2009, with ODEQ (the "2009 Consent Decree") which defines Cyprus's project performance obligations as "implement[ing] a Remedial Action Work Plan in accordance with the [CSP] Action Memorandum." App. Vol. 19 at 174. TCI states that "the Collinsville Soil Program and the Collinsville Town Site are largely synonymous, as evidenced by the way those terms were used by the parties and the District Court." Aplt. Br. at 13. We understand the Collinsville Soil Program to refer to the response action outlined in the CSP Action Memorandum and the Collinsville Town Site (sometimes referred to as the Collinsville townsite) to be the area, or a part of the area, subject to the plan outlined in the CSP Action Memorandum. We refer to this area as the CSP Study

10

Area for consistency with the maps the parties presented and to avoid confusion given multiple definitions involving the term "site."

For the purposes of the 2009 Consent Decree between Cyprus and ODEQ, the "Site" is defined as:

> all residential properties, commercial properties, houses of worship, childcare facilities, alleys, vacant fields, parks and schools located within the corporate limits of the City of Collinsville or within one mile of such limits or anywhere Waste Materials from the former Bartlesville Zinc Company Smelter Site have come to be located.

App. Vol. 19 at 173.  The CSP Action Memorandum was attached as an appendix to the 2009 Consent Decree and states: "The project has been designated as the Collinsville Soil Program and includes the Collinsville townsite and any adjacent areas potentially impacted by two zinc smelting facilities that historically operated about one mile south of town."  App. Vol. 19 at 197.

Cyprus has engaged in various cleanup activities in accordance with the CSP Action Memorandum.  Believing TCI, as successor or indemnitor of NJZ, is responsible for some of the waste distributed throughout the Collinsville area, Cyprus sued TCI for contribution under CERCLA.[1]  Cyprus sought damages for cleanup costs already incurred and a declaratory judgment recognizing TCI's liability for future cleanup costs.  TCI admitted that it is the successor-in-interest to NJZ, which left the corporate relationship between NJZ and TFMC for the district court's resolution.

---

[1] Cyprus raised additional claims and named other corporate entities as defendants, but those claims are not relevant to this appeal.

11

Cyprus requested the district court pierce TFMC's corporate veil and hold TCI liable as NJZ's successor for TFMC's share of cleanup costs. Applying Kansas law, the district court addressed cross-motions for partial summary judgment and pierced TFMC's corporate veil as a matter of law. After a bench trial, the district court made findings of fact and conclusions of law and entered judgment in favor of Cyprus, holding TCI liable for contribution in the amount of $14,265,070.20 and 45% of any future response costs.

In its findings of fact and conclusions of law, the district court determined that TCI was a "covered person" as the former owner or operator of a facility who disposed of a hazardous substance within the area because the TFM Smelter, like the BZ Smelter, was part of the CERCLA facility located within the CSP Study Area. The district court found no support for the theory that the TFM Smelter caused contamination through aerial dispersion. Rather, it found that the waste was "widely used by residents of Collinsville" on residential and other properties. App. Vol. 43 at 164. The district court noted that the material was used as fill for buildings, roads, and other projects, which was a common practice near all smelters at the time the BZ Smelter and TFM Smelter operated. It found this transport by residents was a viable migration pathway for the waste. The district court also noted that Cyprus met its burden of showing that hazardous substances released by TCI caused Cyprus to incur necessary response costs and that Cyprus complied with the National Contingency Plan ("NCP"). It rejected Cyprus's alternate theory that TCI was a covered person as an arranger for the disposal of hazardous materials within the CSP Study Area.

12

In its conclusions of law, the district court stated that CERCLA defines "facility" broadly and that "a facility will ordinarily encompass the entire site or area where hazardous substances came to be located." *Id.* at 184–85. In Conclusion of Law 9, it stated: "The evidence presented at trial establishes that hazardous substances from the BZ and TFM Smelters came to be located on-site and offsite within the CSP study area, and the Court finds that entire area should be treated a single facility for the purpose of plaintiff's CERCLA claim." *Id.* at 185.

TCI appeals the district court's order piercing TFMC's corporate veil and also the district court's determination that TCI can be liable as a former owner or operator of the TFM Smelter for waste found in the CSP Study Area. TCI states the issues appealed as follows:

> 1. Did the District Court commit legal error in its construction and application of Kansas Law by piercing the corporate veil of the Tulsa Fuel & Manufacturing Company ("TFMC") on an evidentiary record that cannot satisfy each prong of the onerous two-part test Kansas requires to do so?
>
> 2. Did the District Court commit legal error of statutory construction by interpreting and applying the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.*, in a manner that conflicts with § 9613(f) of CERCLA and renders § 9607(a)(3) of CERCLA superfluous?

Aplt. Br. at 5.

## II

We affirm the district court's grant of Cyprus's motion for partial summary judgment piercing the corporate veil of TFMC, a subsidiary of NJZ, TCI's predecessor.

13

A

We review the district court's partial summary judgment order piercing the corporate veil de novo. The parties dispute the applicable standard of review. TCI argues that appeals from cross-motions for summary judgment are reviewed de novo, and that we, like the district court, "must view the inferences to be drawn from affidavits, attached exhibits and depositions in the light most favorable to the party that did not prevail." *Allen v. Sybase, Inc*. 468 F.3d 642, 649 (10th Cir. 2006) (internal quotations omitted). Cyprus contends review for abuse of discretion should apply because the piercing of the corporate veil is an equitable remedy. We have reviewed de novo summary judgment orders refusing to pierce the corporate veil, and we apply that same standard here to a ruling which permits the piercing of the corporate veil. *See Skidmore, Owings & Merrill v. Canada Life Assur. Co.*, 907 F.2d 1026, 1026–27 (10th Cir. 1990) (per curiam). Moreover, other circuits have reviewed de novo summary judgment orders piercing the corporate veil. *See, e.g., UA Local 343 United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Industry of the U.S. & Canada, AFL-CIO v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir. 1994); *see also Rd. Sprinkler Fitters Local Union No. 669, U.A., AFL-CIO v. Dorn Sprinkler Co.*, 669 F.3d 790, 793–94 (6th Cir. 2012) ("[W]hile clear-error review may be appropriate for alter-ego determinations made later in litigation, de novo review is the appropriate standard where an alter-ego determination was made as part of a decision to grant or deny summary judgment."). We note that the district court did not re-decide the veil piercing question after the

14

bench trial; it merely noted in its findings of fact and conclusions of law that it previously pierced TFMC's corporate veil.

On summary judgment, a court views the facts in the light most favorable to the party opposing the motion, drawing all reasonable inferences in the opposing party's favor. *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1266 (10th Cir. 2015). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). "Although we have said that the decision whether or not to pierce the corporate veil is primarily a factual one it is also clear that a verdict [denying veil piercing] as a matter of law may be justified where the facts, viewed most favorably to the party seeking to pierce the veil, do not justify such a result." *Boughton v. Cotter Corp.*, 65 F.3d 823, 836 n.22 (10th Cir. 1995) (applying Colorado veil-piercing factors which mirror the Kansas factors). Conversely, piercing the corporate veil as a matter of law may be justified where the facts, viewed most favorably to the party opposing piercing the corporate veil, justify veil piercing.

It is "a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." *See United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotations omitted). "[C]orporate veils exist for a reason and should be pierced only reluctantly and cautiously. The law permits the incorporation of businesses for the very purpose of isolating liabilities among separate entities." *Cascade Energy &*

15

*Metals Corp. v. Banks*, 896 F.2d 1557, 1576 (10th Cir. 1990), *cert. denied*, 498 U.S. 849 (1990) (applying Utah law). "To be sure, courts sometimes pierce the corporate veil and disregard the corporate form. But we do so to prevent the corporation's owners from abusing the legal privilege of the corporate form when they seek to use that privilege to perpetrate a fraud or injustice." *Somerlott v. Cherokee Nation Distribs., Inc.*, 686 F.3d 1144, 1157 n.1 (10th Cir. 2012) (Gorsuch, J., concurring). The law presumes that "a holding or parent company has a separate corporate existence and is treated separately from the subsidiary." *Quarles v. Fuqua Indus., Inc.*, 504 F.2d 1358, 1362 (10th Cir. 1974) (applying Kansas law).

Under Kansas law, the presumption of corporate separateness is only overcome with proof of two elements: (1) "allowing the legal fiction of a separate corporate structure would result in an injustice toward the plaintiff" and (2) in consideration of ten factors (the *Doughty* factors), a subsidiary is an alter ego of its parent. *Doughty v. CSX Transp., Inc.*, 905 P.2d 106, 111 (Kan. 1995).

> The 10 factors are whether: (1) the parent corporation owns all or a majority of the capital stock of the subsidiary; (2) the corporations have common directors or officers; (3) the parent corporation finances the subsidiary; (4) the parent corporation subscribed to all of the capital stock of the subsidiary or otherwise caused its incorporation; (5) the subsidiary has grossly inadequate capital; (6) the parent corporation pays the salaries or expenses or losses of the subsidiary; (7) the subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation; (8) in the papers of the parent corporation, and in the statements of its officers, the subsidiary is referred to as such or as a department or division; (9) the directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation; and (10) the formal legal

16

requirements of the subsidiary as a separate and independent corporation are not observed.

*Id.* These listed factors are only "guidelines." *Id.* "[N]o single factor or combination of factors is necessarily conclusive in determining whether to apply the alter ego doctrine." *Moorhouse v. City of Wichita*, 913 P.2d 172, 181 (Kan. 1996). The factors are not tallied but are "taken as a whole with due regard to the extent to which they were and were not fully satisfied." *Boughton*, 65 F.3d at 838 (analyzing same ten factors).

B

The district court determined that the injustice portion of the test was satisfied and then separately considered the *Doughty* factors, determining they supported the conclusion that TFMC was an alter ego of NJZ.

1

The district court determined that "it would be a fraud or injustice to third parties for NJZ to affirmatively represent to the ICC that TFMC was effectively a department of NJZ for the purpose of recovering from a third party, while TCI attempts to argue in this case that NJZ and TFMC were entirely separate corporations in an effort to avoid liability under CERCLA." App. Vol. 17 at 104 n.7. The district court's view of the circumstances presented is persuasive.

TCI makes much of the district court's statement that "Cyprus has not produced direct evidence that NJZ used the corporate form to commit a fraud or injustice against Cyprus." *Id.* at 104. In doing so, however, TCI misconstrues the

17

applicable legal standard. There is no need to show that NJZ or TFMC abused the corporate form specifically to avoid *this* lawsuit, or even lawsuits involving Cyprus or CERCLA actions more generally. To be sure, purposeful undercapitalization to avoid a potential judgment is "the principal injustice that might lead a court to disregard the separateness of affiliated entities." *Sac & Fox Nation, Inc. v. Containment Sols., Inc.*, 17-2416-JWB, 2018 WL 3495854, at \*6 (D. Kan. July 20, 2018). But nothing in the caselaw indicates that it is the only injustice that can support piercing the corporate veil. Indeed, the Kansas Supreme Court has phrased the injustice question as whether "recognition of the subsidiary as a distinct entity *would result* in an injustice to *third parties*." *Doughty*, 905 P.2d at 111 (emphasis added). In other words, the test as applied here asks whether the outcome of the present litigation would be unjust if a court refused to pierce TFMC's corporate veil.

We conclude an unjust outcome would result to third parties if the district court refused to pierce the corporate veil in this case. As is evident, TCI now takes a position contrary to the one its corporate predecessor took before the ICC. While a finding that NJZ could act as an agent for TFMC would not necessitate a finding that TFMC was NJZ's alter ego, NJZ claimed more than an agency relationship by representing unequivocally to the ICC that TFMC was merely an instrumentality of NJZ. Either TFMC was NJZ's alter ego, or it was not. A parent company cannot reap the benefits of having an alter ego without also having to bear its burdens.

Further, Cyprus suggests (and TCI offers no evidence to the contrary) that TFMC only existed as a separate corporation because a foreign corporation could not

18

own a subsidiary organized under Kansas law in 1906.  TCI offers no alternate explanation for NJZ's representations to the ICC regarding TFMC's ownership, which were inconsistent with contemporaneous representations made to the State of Kansas.  The practice of holding TFMC out as a distinct entity while at the same time representing TFMC was a mere component of NJZ could be seen as a fraudulent attempt to skirt Kansas law.

Finally, TCI makes an opaque argument that affirming the district court would mean TCI could be held liable for any subsidiary's liabilities "simply by disagreeing with any court's consideration of the *Doughty* factors" and that this would "eviscerate[] the fraud/injustice prong under Kansas law and improperly collapse[] its conjunctive analysis into mere a [sic] one-prong alter ego test."  Aplt. Br. at 29.  TCI misreads the district court's ruling, which separately addressed the fraud/injustice element and then applied the *Doughty* factors.  Contrary to TCI's view, the issue here as regards the fraud/injustice element is not whether TCI disagrees with a court's consideration of the *Doughty* factors, but rather whether TCI changes its characterization of the relationship between NJZ and TFMC when it is to its advantage.  By requiring proof of the fraud/injustice prong separately from the listed *Doughty* factors, it would be possible to determine that one element was met, but not the other, even though the two elements might be supported by similar proof.

2

The district court also looked to the ten factors listed in *Doughty* and determined that TFMC was NJZ's alter ego.  Considering the listed *Doughty* factors,

19

it determined that factors one (stock ownership), two (common officers or directors), eight (reference to the subsidiary as a department or division), and nine (officers or directors acting in the interests of the parent and not of the subsidiary) supported an alter ego finding. It determined the other factors were neutral or did not include them in its analysis. It did not determine that any factors opposed an alter ego finding. Although not listed within the listed *Doughty* factors, the court also considered NJZ's prior representations to the ICC an additional indicia of NJZ's disregard of TFMC's corporate separateness.

The factors that the district court weighed in favor of an alter ego finding are based on undisputed evidence. Despite TFMC's annual statements listing individuals associated with NJZ as TFMC shareholders, NJZ held itself out as TFMC's sole shareholder. Given that TFMC was incorporated under the laws of Kansas in 1906, when the ability of a foreign entity to invest in a Kansas entity was limited, the logical conclusion is that NJZ was flouting Kansas law to operate a subsidiary. Moreover, NJZ conducted itself as if it owned all of TFMC's capital stock. The on-paper ownership is not dispositive here, especially given that the entire point of a veil-piercing analysis is to determine whether on-paper representations are in fact a fiction. To argue, as TCI does, that since NJZ did not own TFMC's stock, TFMC was not a subsidiary, fails on this record. The commonality of NJZ's and TFMC's officers and directors heavily supports an alter ego finding. The record indicates there was a substantial overlap of key officers and directors who held the same positions in TFMC as they held in NJZ. NJZ's referring to TFMC as a department or

20

division of NJZ also supports an alter ego finding: TFMC is shown as a subset of

NJZ's manufacturing department in NJZ's organizational chart, and NJZ effectively

argued to the ICC that TFMC was in practice a department or division rather than

opting for a narrower agency argument.  Moreover, nothing in the caselaw indicates

that consistent reference to the subsidiary as a department or division is required.

Presumably, if there is a veil-piercing inquiry at issue, there will be at least some

historic reference to a subsidiary as a subsidiary.  And while nothing in the record

indicates that TFMC's officers or directors took any specific action which benefited

NJZ to the detriment of TFMC, neither does the record indicate that they took any

specific action which benefited TFMC to the detriment of NJZ.[2]  The record does

indicate that TFMC's officers or directors at least received direction from NJZ,

including directions to cut back operations for NJZ's benefit and that NJZ's officers

acted "without regard to corporate lines of separation."  App. Vol. 17 at 114.  The

record does not indicate that officers allegedly acting on behalf of TFMC ignored

NJZ's directions.

　　　　The district court correctly considered the tenth factor (observation of

corporate formalities) as neutral.  TFMC had at least one shareholder meeting, but

there is no evidence of any others.  While TFMC filed annual statements with the

---

[2] The Supreme Court has stated that "the presumption that an act is taken on behalf of the corporation for whom the officer claims to act is strongest when the act is perfectly consistent with the norms of corporate behavior, but wanes as the distance from those accepted norms approaches the point of action by a dual officer plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent." *Bestfoods*, 524 U.S. at 70 n.13 (1998).

State of Kansas, the stock ownership listed on those statements is inconsistent with representations that NJZ owned all of TFMC's stock. While there is evidence that TFMC owned property in its own name, there is evidence that NJZ controlled the operation of that property. Accordingly, this factor cannot be weighed in either direction.

The district court also correctly refused to consider other factors. It declined to wade into a battle of the experts regarding TFMC's finances. In addition to involving factual disputes that cannot be resolved on summary judgment, the historical record of TFMC's finances is incomplete and stale. Moreover, the caselaw is clear that no single *Doughty* factor or factors are dispositive, so TCI's argument that Cyprus cannot pierce the corporate veil without showing financial dominance and control is unpersuasive.

Finally, and most persuasively, the district court relied on NJZ's own statements regarding TFMC's corporate status: the statement in *Zinc* magazine that "the parent company and its lines of organization and routines carry through all the subsidiaries," *id.* at 97; the "War Work" report stating that "all material is charged at cost as it passes into the next department," *id.*; Palmer's affidavit stating that "[a]s the owner of the stock of its subsidiary companies [NJZ] controls their operations, the purchase of all materials and the sale of all products," *id.*; prepared testimony to the ICC that the "entire capital stock [of TFMC] is owned by [NJZ]," that NJZ "possesses consequent to that absolute ownership, complete control of all the affairs of its subsidiaries . . . and in fact and in actual practice does exercise complete

22

control in the general conduct of its and their business, and it acts as agent for and in behalf of its subsidiaries," and that "lines of authority of [NJZ's] personnel extend to all companies, so that its executives and their staff function without regard to corporate lines of division," *id.* at 95; a chart presented to the ICC indicating that TFMC was a part of NJZ's manufacturing department; a written statement by George introduced to the ICC that he could act on TFMC's behalf "as general traffic manager of [NJZ] through the authority of the latter to act for the former," *id.* at 96; and supplemental briefing to the ICC that NJZ "owns all the capital stock of its subsidiary companies . . . and, consequent to such absolute ownership, possesses complete control of all the affairs of its subsidiaries, and in fact and in actual practice does exercise such complete control in the general conduct of its and their business, and it acts as agent for and in behalf of its subsidiaries," *id.*  Cyprus could hardly ask for more compelling facts in support of an alter ego conclusion than these.

While the district court's reasoning on these additional considerations partially overlaps with its reasoning on the injustice element, it is equally persuasive here. Given the general scarcity of evidence about a company that no longer exists, contemporaneous, sworn representations by the individuals who actually ran TFMC and NJZ are particularly compelling.  TCI does not challenge the veracity of these statements.  And these individuals certainly had a more accurate perspective of TFMC and NJZ's relationship and their day-to-day operations than anyone could provide today.  They represented that TFMC was an instrumentality of NJZ and suggested by their statements that any distinction between the two corporations was a

23

mere formality.  While NJZ maintained that TFMC was a separately organized entity, it presented arguments to the ICC contradicting those on-paper representations. Although TFMC and NJZ could have relied on a narrower agency argument to support their position before the ICC, they chose a broader argument to include NJZ's corporate structure and control.  That the ICC credited that argument bolsters its persuasiveness now.  And though some of this evidence applies to NJZ's subsidiaries generally, TCI offers no evidence indicating that TFMC's relationship with NJZ differs from any of NJZ's other subsidiaries.

TCI challenges these conclusions.  It argues that NJZ's lack of stock ownership is nearly dispositive.  We disagree.  First, stock ownership is only one of ten factors.  Second, adopting TCI's view would mean any parent company could avoid veil piercing by listing its subsidiaries' shareholders as individuals, although those same individuals have close ties to the parent company, while also disregarding corporate separateness in practice.  Third, as discussed above, ample undisputed facts support the district court's determination that despite the on-paper representations of ownership, NJZ in fact owned TFMC and TFMC was operated for NJZ's benefit.

3

Related to the broader issue of alter ego liability, TCI claims the district court improperly determined that TFMC was NJZ's alter ego from 1906 to 1926 on evidence that could only support a conclusion that TFMC was NJZ's alter ego from 1918 to 1923.  TCI's arguments are unpersuasive.  First, as discussed above, TFMC was NJZ's alter ego at least for the period between 1918 and 1923.  No evidence

24

indicates that material circumstances changed before 1918 or after 1923, so a conclusion that TFMC was NJZ's alter ego within the 1918 to 1923 time frame would apply as well to periods before and after that time frame. Second, individuals affiliated with NJZ incorporated TFMC in 1906 and when TFMC ceased operation in 1926, NJZ received the dividend paid, and not the individuals listed as TFMC's shareholders. Accordingly, TCI's arguments are unpersuasive.

## III

We affirm the district court's conclusion of law that TCI was a former owner or operator of the CERCLA facility where Cyprus incurred response costs.

## A

TCI limits its challenge to the district court's statutory interpretation and application of CERCLA to "whether TCI can be considered a 'former owner or operator' of a CERCLA facility where Cyprus incurred response costs." Aplt. Br. at 44. It frames this issue as an appeal of the district court's Conclusion of Law 9, which states in pertinent part: "The evidence presented at trial establishes that hazardous substances from the BZ and TFM Smelters came to be located on-site and offsite within the CSP study area, and the Court finds that entire area should be treated a single facility for the purpose of plaintiff's CERCLA claim." App. Vol. 43 at 185. While this determination does rely on the facts, those facts are not in dispute. We review conclusions of law made after a bench trial de novo. *State Ins. Fund v. Ace Transp. Inc.*, 195 F.3d 561, 564 (10th Cir. 1999). We agree with the district court that hazardous waste from the TFM Smelter, which was indistinguishable from

the BZ Smelter waste, came to be located within the CERCLA facility at issue and

that TCI is liable for contribution.

Under CERCLA, a plaintiff who has been held responsible for cleanup costs

can seek contribution from a defendant if the defendant could have been held

responsible for some of those cleanup costs in the first place. *See Friedland v.*

*TIC-The Indus. Co.*, 566 F.3d 1203, 1206 (10th Cir. 2009); *see also* 42 U.S.C.

§ 9613(f).[3]  A plaintiff seeking contribution must establish a prima facie case that the

---

[3] The statute states:

(1) Contribution

Any person may seek contribution from any other person who is liable
or potentially liable under section 9607(a) of this title, during or
following any civil action under section 9606 of this title or under
section 9607(a) of this title. Such claims shall be brought in accordance
with this section and the Federal Rules of Civil Procedure, and shall be
governed by Federal law. In resolving contribution claims, the court
may allocate response costs among liable parties using such equitable
factors as the court determines are appropriate. Nothing in this
subsection shall diminish the right of any person to bring an action for
contribution in the absence of a civil action under section 9606 of this
title or section 9607 of this title.

(2) Settlement

A person who has resolved its liability to the United States or a State in
an administrative or judicially approved settlement shall not be liable
for claims for contribution regarding matters addressed in the
settlement. Such settlement does not discharge any of the other
potentially liable persons unless its terms so provide, but it reduces the
potential liability of the others by the amount of the settlement.

(3) Persons not party to settlement

defendant is liable for cleanup costs under CERCLA. *See Morrison Enters. v. McShares, Inc.*, 302 F.3d 1127, 1135 (10th Cir. 2002); *see also* 42 U.S.C. § 9607(a). To establish a prima facie case of liability, the plaintiff must show that (1) the defendant is a "covered person" under CERCLA; (2) a "release" or "threatened release" of a "hazardous substance" occurred at the site in question; (3) such release or threatened release caused plaintiff to incur costs; (4) the plaintiff's response costs were "necessary" costs of response; and (5) the plaintiff's response was consistent with the NCP. *Morrison Enters.*, 302 F.3d at 1135–36. The only issue remaining for decision here is whether TCI (as successor-in-interest) is a covered person.

The definition of a "covered person" includes, as relevant here, the former owner or operator of a facility where hazardous substances were disposed of at the time they were disposed (a "former owner or operator") under 42 U.S.C.

---

(A) If the United States or a State has obtained less than complete relief from a person who has resolved its liability to the United States or the State in an administrative or judicially approved settlement, the United States or the State may bring an action against any person who has not so resolved its liability.

(B) A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement referred to in paragraph (2).

(C) In any action under this paragraph, the rights of any person who has resolved its liability to the United States or a State shall be subordinate to the rights of the United States or the State. Any contribution action brought under this paragraph shall be governed by Federal law.

42 U.S.C. § 9613(f).

27

§ 9607(a)(2), or someone who arranged for the transport of hazardous materials (an "arranger") under 42 U.S.C. § 9607(a)(3).  A party can be a former owner or operator of a facility even if they only owned or operated a part of that facility.  *See Chevron Mining Inc. v. United States*, 863 F.3d 1261, 1270 (10th Cir. 2017).

Under CERCLA, the definition of "facility" includes "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located."  42 U.S.C. § 9601(9)(B); *see also Sierra Club v. Seaboard Farms Inc.*, 387 F.3d 1167, 1171–72 (10th Cir. 2004) (noting that the definition includes a "catch-all provision").  Given the statutory definition of "facility," "CERCLA's remedial purpose," and cases from other federal courts, this court recognizes that the definition of "facility" is broad: "'facility' means whatever is appropriate for the facts at hand . . . 'Simply put, the term "facility" includes every place where hazardous substances come to be located.'"  *Sierra Club*, 387 F.3d at 1171–72, 1176 (quoting *United States v. Conservation Chem. Co.*, 619 F. Supp. 162, 185 (W.D. Mo. 1985)).

## B

Cyprus presented three theories in support of TCI's liability: TCI was a former owner or operator of a facility that released airborne particles of waste which settled in the CSP Study Area; TCI was a former owner or operator of a facility that caused waste to be located in the CSP Study Area through the viable migration pathway of residents and others picking up waste materials from the smelter for use in various projects; and TCI was an arranger who caused waste materials to be located in the

CSP Study Area by arranging for transport of waste by residents and others who used the materials in various projects. The district court rejected the airborne theory and the arranger theory but credited the former owner or operator theory that residents taking waste away from the TFM smelter and into the rest of the CSP Study Area was a viable migration pathway. As we agree with the district court on the theory it credited, we do not comment on whether it erred in rejecting the others.

The CSP Study Area, which includes the location of both former smelters, is a single CERCLA facility. This is plain when the definition of "facility" in 42 U.S.C. § 9601(9)(B) is read with the definition of the "Site" in the 2009 Consent Decree between Cyprus and ODEQ:

> "Site" shall mean all residential properties, commercial properties, houses of worship, childcare facilities, alleys, vacant fields, parks and schools located within the corporate limits of the City of Collinsville or within one mile of such limits or anywhere Waste Materials from the former Bartlesville Zinc Company Smelter Site have come to be located.

App. Vol. 19 at 173. While the definition in the 2009 Consent Decree mentions waste from the BZ Smelter specifically, it does not exclude waste from the TFM Smelter. Neither does the definition of "Site" in ODEQ's complaint carve out the TFM Smelter—indeed, the complaint specifically references it:

> ODEQ seeks an order requiring Cyprus Amax to perform response actions in residential, commercial, and public areas in the vicinity of the City of Collinsville, Tulsa County, Oklahoma (hereinafter Collinsville) and a declaratory judgment that Cyprus Amax is liable for response costs incurred by ODEQ in connection with the response action in residential, commercial, and public areas in the vicinity of Collinsville (hereinafter those areas will be referred to as the Site). . . .

> Collinsville is located about one mile north of two former zinc smelters: the Collinsville Zinc Smelter and the Tulsa Fuel and Manufacturing Zinc Smelter (hereinafter the Tulsa Fuel Smelter Site). . . .

> ODEQ and/or EPA have requested that the companies associated with the two historic smelter sites conduct a more comprehensive soil investigation and clean up program in Collinsville.

App. Vol. 20 at 41–44.  The CSP Action Memorandum, which is incorporated into the 2009 Consent Decree, specifically references the TFM Smelter when describing the project name and location.  "The project has been designated as the Collinsville Soil Program, and includes the Collinsville townsite and any adjacent areas potentially impacted by two zinc smelting facilities that historically operated about one mile south of town."  App. Vol. 19 at 197.  The CSP Action Memorandum goes on to specifically name and describe both smelters when describing the site conditions and background which are the focus of the project.  *Id.* at 197–98.

Given these definitions, the district court correctly concluded that the "entire area [the CSP Study Area] should be treated as a single facility for the purpose of plaintiff's CERCLA claims."  App. Vol. 43, 185.  It is immaterial that TCI only owned or operated a relatively small part of this facility—for that matter, so did Cyprus, and this court reads CERCLA's definition of "facility" broadly.  *See Chevron Mining*, 863 F.3d at 1270.  Moreover, the district court correctly identified a viable migration pathway by concluding residents and others transported waste from the smelters to other locations within the CSP Study Area.  The use of smelter waste for residential and road building projects was a common practice at the time, and TCI cites no precedent indicating this transport by the public was not a viable migration

30

pathway. Moreover, the record supports a determination that this transport occurred while the TFM Smelter was operational: newspaper articles in the *Collinsville Times* and *Collinsville Star* from that time indicated that waste from the two smelters was used in construction projects. *See* App. Vol. 43 at 166, 168, 176–77.

TCI contends that this is really a two-site case and that the district court's rejection of the arranger theory of liability is therefore fatal to Cyprus's claims. We disagree. The district court's rejection of the arranger theory of liability is not fatal to Cyprus's contribution claims because the district court credited a theory TCI now tries to ignore: that waste TCI produced migrated from one part of the relevant CERCLA facility (the TFM Smelter) to other parts of the same CERCLA facility (scattered throughout the CSP Study Area).

TCI suggests that separate cleanup efforts at the TFM Smelter indicate it is a separate facility and, according to TCI, that negates any attempt by Cyprus to obtain contribution from TCI under a former owner/operator theory of liability. TCI argues if the TFM Smelter and CSP Study Area are separate facilities, TCI would not be a former owner or operator of the CSP Study Area. *See Colorado v. Sunoco, Inc.*, 337 F.3d 1233, 1241 (10th Cir. 2003) (addressing statute of limitations issue and stating "there will only be one such 'response action' per facility or site"). Again, we disagree. In any given facility, there can be one removal action *plus* one remedial action. *See id.*; *Exxon Mobil Corp. v. United States*, 335 F. Supp. 3d 889, 916 (S.D. Tex. 2018) ("The Tenth Circuit's reasoning, which appears most consistent with the other courts that have considered the issue, that there can be only one removal action

31

and only one remedial action per facility, is persuasive."). While the distinction is far from crystal clear and there may be overlap between the two, "[g]enerally, a removal action costs less, takes less time, and is geared to address an immediate release or threat of release. In broad contrast, a remedial action seeks to effect a permanent remedy to the release of hazardous substances when there is no immediate threat to the public health. Remedial actions usually cost more and take longer. Elements of either response action may overlap and semantics often obscure the actual nature of the cleanup performed." *Pub. Serv. Co. of Colo. v. Gates Rubber Co.*, 175 F.3d 1177, 1182 (10th Cir. 1999) (internal citations omitted); *see also Sunoco*, 337 F.3d at 1240.

At oral argument, counsel for TCI indicated that the actions taken at the TFM Smelter and in the rest of the CSP Study Area were two separate remedial actions *and* that the 2009 Consent Decree represented both a removal and remedial action for the CSP Study Area. We disagree: the 2009 Consent Decree is a remedial action, while governmental action limited to the TFM Smelter is a removal action. The more targeted effort to immediately clean up the abandoned smelter before addressing the broader area carries the hallmarks of a removal action. Meanwhile, the more daunting task of identifying waste and cleaning it up in the wider Collinsville area is a remedial action. Accordingly, the fact that there are two separate responses does not mean that there are two CERCLA facilities.

Moreover, this conclusion does not eviscerate the arranger theory of liability in other circumstances. A party who arranges transport of waste from one site to a separate site could still be held liable under the arranger theory.

Because we view this as a one-facility case, the migration of waste was from two areas within the facility (the smelters) to other parts of the same facility (scattered throughout Collinsville and the surrounding area) and occurred as a routine part of zinc smelter operations in the early twentieth century. Further, this view negates TCI's argument that Cyprus is trying to recover for a site it never had to clean up because the government is cleaning up the TFM Smelter. *See Territory of Guam v. United States*, 141 S. Ct. 1608, 1612 (2021) ("A contribution suit does not exist in a vacuum, but rather is a tool for apportioning the burdens of a predicate 'common liability' among the responsible parties."). Here, Cyprus is seeking contribution because in its cleanup efforts, it has had to remediate damage caused by its own smelter as well as damage caused by TCI's smelter in the Collinsville area, even though it is not tasked with cleaning up the TFM Smelter itself.

Therefore, the district court did not err in determining the CSP Study Area, inclusive of both smelters, was a single CERCLA facility and that TCI could be held liable for contribution to the facility's cleanup.

IV

For the forgoing reasons, we AFFIRM the district court.